UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

GARON FOODS, INC.,

    Plaintiff,

           v.

SARAH MONTIETH,

    Defendant.

Case No. 13-cv-214-JPG-PMF

**MEMORANDUM AND ORDER**

This matter comes before the Court on the motion for a preliminary injunction filed by plaintiff Garon Foods, Inc. ("Garon") (Doc. 13). Defendant Sarah Monteith[1] ("Sarah") has responded to the motion (Doc. 14). The Court held a hearing on the motion on June 20, 2013, at which Sarah, Sharon Griesbach ("Sharon"), Shalisha Wood ("Shalisha") and Gary Griesbach ("Gary") testified. Sharon and Gary own Garon, and Shalisha, their daughter, is a Garon employee.

**I.    Preliminary Injunction Standard**

Preliminary injunctive relief is designed "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortg. Corp. v. Platinum Fin. Group Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). A party seeking a preliminary injunction must make a threshold showing that (1) it has some likelihood of success on the merits, (2) no adequate remedy at law exists, and (3) it will suffer irreparable harm if the injunction is not granted. *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007); *Ferrell v. United States Dep't of Housing & Urban Dev.*, 186 F.3d 805, 811 (7th Cir. 1999). If the moving party is able to establish these three factors, the Court must then balance the harms to both parties using a "sliding scale"

---

[1] "Monteith" is spelled incorrectly in the complaint as "Montieth."

analysis, also taking into consideration the effect that granting or denying the injunction will have on the public. *Ferrell*, 186 F.3d at 811. "[T]he greater the moving party's likelihood of prevailing on the merits, the less strongly it must show that the balance of harms weighs in its favor." *Id*.

"A preliminary injunction is an extraordinary remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Chicago Dist. Council of Carpenters Pension Fund v. K & I Constr., Inc.*, 270 F.3d 1060, 1064 (7th Cir. 2001) (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam)); *accord Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "[T]he district [court] has to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988).

**II.     Facts**

The evidence elicited at the hearing establishes the following facts for the purposes of the pending motion for a preliminary injunction.

Sarah was an employee of Garon from November 2011, until she voluntarily resigned in February 2013. Garon is in the business of selling peppers to cheese manufacturers for use in making pepper jack cheese. It essentially acts as a distributor for peppers it obtains from a supplier ("Supplier") that Garon relabels and distributes to its pepper jack cheese manufacturing customers under Garon's name. Sarah held various positions at Garon, including in logistics, sales and purchasing. During her time at Garon, she had access to a computer program listing the names of Garon's customers, and she was specifically assigned to manage the accounts of a small number of customers (around five at any one time).

Prior to starting her employment, Sarah signed a document entitled "Garon Trade Secrets Confidentiality Agreement" ("Agreement") in which she agreed to hold Garon's trade secrets

confidential and to refrain from using them for anything other than Garon's benefit. Under the Agreement, the following information was designated as trade secrets: customer lists, customer products, customer pricing, data, designs, financial records, formula, packaging, procedures, processes, suppliers, vendors, and other confidential information. Garon required anyone with access to this confidential information to sign the Agreement. Garon further protected some of this information on a computer system with individual passwords and by hiding it on its computer server. At the time of her resignation, Sarah signed another document in which she acknowledged the Agreement's non-disclosure provisions. Garon never asked Sarah to sign a covenant not to compete with Garon.

During Sarah's employment with Garon, she sent an e-mail with some of the foregoing confidential information to her personal e-mail account. She did this with the permission of Sharon and Shalisha and for the purpose of preparing for a meeting to address a customer complaint that had arisen while Gary, Sharon and Shalisha were on vacation. She has since deleted this e-mail from her personal e-mail account. On one occasion, Sarah also sent a purchase order containing confidential information to a trucking company to facilitate an urgent transportation request. During her employment, Sarah also regularly deleted e-mails from her Garon e-mail account as a housekeeping measure. When Sarah resigned, she was escorted from Garon's property and took no documents with her. She did retain in her memory the names of purchasing agents of certain Garon customers and general knowledge of the industry, such as "ballpark" pricing arrangements. Any specific pricing details Sarah retained in her memory are likely to be obsolete within a year or less due to the fluctuation of product prices.

After Sarah's resignation, she began working as an independent contractor for the Supplier of peppers to Garon. This was the Supplier's first attempt to market its product directly to cheese manufacturers.

No credible evidence shows Sarah gave the Supplier any of Garon's confidential information or trade secrets. However, Garon alleges Sarah breached the Agreement on February 19, 2013, when she began marketing the Supplier's products directly to pepper jack cheese manufacturers, which included Garon's customers. Specifically, Sarah sent mass e-mails to the purchasing agents of the companies on a list of pepper jack cheese manufacturers. She had not obtained the manufacturer list from Garon but derived it on her own through internet searches. She had remembered some of the purchasing agents' names from her work at Garon but had obtained others, along with contact information, through telephone calls to the manufacturers. She did not specifically target any of Garon's customers with her e-mail solicitations, but she did not avoid them either. However, some of the mass e-mails contained references from which the manufacturer could easily draw the conclusion that the Supplier was Garon's source of the products Garon sold under its own name. For example, one mass e-mail referred to specific weights of specific products in specific types of packaging (pails, drums or totes) sold by Garon and identified that product as originating from the Supplier. *See* Pl. Ex. 8. It also provided quality audit documentation from the Supplier in hopes that manufacturer would correctly conclude that the product it was currently receiving had originated with the Supplier. *Id.* The e-mail also touted the Supplier as approved by a major cheese manufacturer. *Id.*

Another mass e-mail offered to sell the Supplier's product to manufacturers using standard packaging methods (pails, drums and totes) "at a significant cost savings and with shorter lead times" than the manufacturer could get through a distributor. *See* Pl. Ex. 4. The e-mail further contained a specification sheet for a product that this customer had purchased from Garon. *Id.* Based on this e-mail, one Garon customer drew the conclusion that since he knew Sarah from Garon and since she was now offering to avoid the distributor middle-man, she had begun working directly for Garon's supplier. *See* Pl. Ex. 4.

4

Despite receiving a cease and desist letter from Garon's counsel, Sarah continues to solicit business for the Supplier. Sarah has not brought any new customers to the Supplier since her marketing efforts began, but Garon has lost one long-time customer who generated more than $200,000 of business a year. The evidence does not support the inference that this loss was attributable to Sarah. If the Supplier is able to draw customers away from Garon, Garon's reputation in the industry would suffer and it would be nearly impossible to get its customers back. Garon is unable to say, however, how many of the roughly 2000 cheese manufacturers in the country or of the roughly 500 cheese manufacturers in Wisconsin are its customers. Also, Garon may lose customers if they find out a former Garon employee is not keeping confidential information about which manufacturers actually make cheese for which other cheese companies. Additionally, since Sarah began working for the Supplier, the Supplier has increased the product prices it charges Garon, which Garon has been forced to pass along to its customers to its detriment.

Garon filed this lawsuit in March 2013 alleging Sarah breached the Agreement by revealing confidential information and violated the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.*, by misappropriating Garon's trade secrets. In May 2013, Garon asked the Court to issue a preliminary injunction barring Sarah from using or disclosing Garon's confidential information or trade secrets, ordering her to return all confidential information or trade secrets within her possession, and ordering her to disclose everyone to whom she provided Garon's confidential information or trade secrets and all the customers she has contacted since leaving Garon.

**III.    Analysis**

    **A.    Likelihood of Success on the Merits**

Garon argues it is entitled to injunctive relief based on both causes of action. The Court

will consider Garon's theories in turn before considering what relief, if any, is appropriate. The Court believes Garon has some likelihood of success on some aspects of these claims, namely, Sarah's direct or indirect disclosure of the Supplier's identity and relationship with Garon and use of past Garon customer purchasing needs and sales terms to solicit customers for the Supplier. This is information not generally known to the public and is likely to be confidential information under the Agreement and/or trade secrets.

        1.        Breach of Contract

The first theory under which Garon seeks relief is breach of contract for Sarah's alleged breach of the Agreement. Sarah acknowledges she entered into the Agreement with Garon. She argues that she did not breach the Agreement because she did not target Garon's customers or give any confidential information to the Supplier.

"Confidentiality agreements . . . are restrictive covenants and under Illinois law are reviewed with a suspicious eye." *Tax Track Sys. Corp. v. New Investor World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007). Specifically, restrictive covenants work in partial restraint of trade and courts must carefully assess their intent to insure they are not used to prevent competition *per se*. *Springfield Rare Coin Galleries, Inc. v. Mileham*, 620 N.E.2d 479, 485 (Ill. App. Ct. 1993). Illinois courts "will enforce such agreements only when the information sought to be protected is actually confidential and reasonable efforts were made to keep it confidential." *Tax Track Sys. Corp.*, 478 F.3d at 787.

It is not likely that Garon can establish that the list of cheese manufacturers Sarah contacted and their contact information was Garon's confidential information. Illinois treats customer lists as confidential information "*only* when the information has been developed by the employer of a number of years at great expense and kept under tight security." *Springfield Rare Coin Galleries*, 620 N.E.2d at 485-86 (emphasis in original). Such information is not considered

confidential where it "was generally available to other employees and known by persons in the trade, could easily be duplicated by reference to telephone directories or industry publications, and when the customers on such lists did business with more than one company or otherwise changed businesses frequently so that their identities were known to the employer's competitors." *Id*. at 930-31.  Sarah obtained the list of cheese manufacturers she contacted by searching the internet, not from Garon's records.  While she remembered the names and contact information of some cheese manufacturing purchasing agents from her experiences at Garon, that information was also available to anyone who diligently tried to get it by phone calls directly to the manufacturers.  The use of this list is not likely to breach the Agreement.

It is not likely that Garon can establish that the packaging of products sold by Garon in pails, drums and totes was confidential information.  Those sorts of packing are standard in the industry and hold no special confidentiality because Garon, too, used them.

It is not likely that Garon can establish Sarah revealed confidential information by saying the Supplier could provide products to cheese manufacturers faster and at a lower cost that had the product been funneled through a distributor.  This is common sense that any business person would realize:  cutting out the middle man often reduces costs and transit time.

It is likely that Garon can show Sarah revealed the confidential identity of the Supplier in violation of the Agreement.  The identity of the Supplier as Garon's source of products is confidential information under the Agreement.  Garon took pains to protect that information by hiding it from its cheese manufacturer customers.  Any communication that identified, either directly or indirectly, the Supplier as Garon's supplier therefore likely breached the Agreement.  For example, Garon was the only manufacturer who sold products in 43-pound pails, 450-pound drums and 1700-pound totes.  Thus, the identification of these specific weights associated with the Supplier was sufficient to reveal the Supplier's identity to Garon's customers who had

7

purchased products in those packages.

It is likely that Garon can show Sarah used confidential information about Garon's customers' past product purchases to market to some cheese manufacturers. For example, she attached to a solicitation e-mail a specification sheet for a product that a Garon customer had purchased from Garon in the past. The customer's needs and purchasing history, as well as the terms of Garon's sales to that customer, that Sarah retained in her memory are likely to be Garon's confidential information under the Agreement, so the Agreement would likely prohibit her from using that information for the Supplier's benefit.

It is not likely Garon can prove Sarah breached the Agreement by sending confidential information to her personal e-mail address. This was done with Sharon and Shalisha's permission and for the purpose of serving Garon's interests. Furthermore, Sarah has since deleted the e-mail containing the confidential information.

It is not likely Garon can prove Sarah breached the Agreement by sending confidential information to the trucking company for the purpose of facilitating delivery of products. While possibly a technical violation of the Agreement, the release of that information was immaterial and apparently caused Garon no harm.

It is not likely Garon can prove Sarah removed any paper documents belonging to Garon. Sarah did not have an opportunity to take documents with her from Garon's property when she was escorted out on her last day, and she explained that she obtained *from the Supplier* a document sent by Garon to the Supplier.

It is not likely Garon can prove Sarah revealed any confidential information when she stated the Supplier was approved by a major cheese manufacturer. That is information about the Supplier that may or may not have any relation to Garon, Garon's products or Garon's customers. Sarah's statement reveals nothing about Garon.

To the extent Garon believes any other action by Sarah revealed confidential information, Garon has waived those arguments by failing to cite relevant caselaw in support of its position or to make relevant arguments at the preliminary injunction hearing. *See Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (perfunctory, underdeveloped and unsupported arguments are waived); *Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000).

In sum, it is likely that Garon can prove Sarah breached the Agreement by revealing the Supplier's identity and using past customer purchasing needs and sales terms to solicit customers for the Supplier.

    2.    <u>ITSA</u>

The second theory under which Garon seeks relief is under the ITSA for misappropriation of trade secrets. The ITSA "provides that a court may enjoin the 'actual or threatened misappropriation' of a trade secret." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1267 (7th Cir. 1995) (quoting 765 ILCS 1065/3(a)). Accordingly, a movant seeking an injunction must "prove both the existence of a trade secret and the misappropriation." *PepsiCo*, 54 F.3d at 1268. The Court must also be mindful that "[t]rade secret law serves to protect 'standards of commercial morality' and 'encourage[] invention and innovation' while maintaining 'the public interest in having free and open competition in the manufacture and sale of unpatented goods.'" *Id*. (quoting 2 Melvin F. Jager, *Trade Secrets Law* § IL.03 at IL-12 (Clark Boardman Callaghan, rev. ed. 1994)). "Yet that same law should not prevent workers from pursuing their livelihoods when they leave their current positions." *PepsiCo*, 54 F.3d at 1268 (quoting *American Can Co. v. Mansukhani*, 742 F.2d 314, 329 (7th Cir. 1984)).

Under the ITSA, a "trade secret" includes:

> Information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not

9

> being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). "Misappropriation" includes:

> (2) disclosure or use of a trade secret of a person without express or implied consent by another person who . . . (B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was . . . (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . .

765 ILCS 1065/2(b).

The Court finds for the reasons discussed above that Garon's trade secrets include the identity of the Supplier and the past customer purchasing needs and sales terms and that Sarah misappropriated those trade secrets by disclosing or using them in her solicitations. Garon is unlikely to be able to prove its customer list is a trade secret. *See Carbonic Fire Extinguishers, Inc. v. Heath*, 547 N.E.2d 675, 677 (Ill. App. Ct. 1989) (customer lists not trade secrets if readily available in public directories)

  B. <u>No Adequate Remedy at Law/Irreparable Harm</u>

In the absence of a preliminary injunction, Sarah may be able to tempt some of Garon's customers to patronize the Supplier instead of Garon, although she had not done so as of the date of her testimony. If this happens with respect to more than a minimal number of customers, Garon will suffer irreparable damage to its business which may result in the end of its business and which cannot be remedied by money damages. *De minimis* disclosure of confidential information or trade secrets such as a one-time disclosure of a single purchase order to a trucking company is unlikely to cause irreparable harm and is able to be remedied by a claim for money damages.

  C. <u>Balancing of Hardships & Public Interest</u>

If the Court grants the requested injunction, Sarah will be extremely limited in her ability to earn a living soliciting cheese manufacturer customers, and the public will suffer harm by the

loss of competition between pepper suppliers. However, if the Court does not grant an injunction, there is a risk Garon will lose business to the Supplier based on Sarah's use of some confidential information or trade secrets. In light of these factors, the Court believes it appropriate to grant an injunction limiting Sarah's solicitation of cheese manufacturers but not prohibiting them, Sarah will still be able to work in her new position without being prevented from attempting to earn a living, but the manner in which she conducts those solicitations must be circumscribed. The limitations described below will protect Garon's confidential information and trade secrets while still allowing the public the economic benefit of fair and increased competition between Garon and the Supplier.

### IV. Preliminary Injunction

For the foregoing reasons, the Court **GRANTS** Garon's motion for a preliminary injunction (Doc. 13) and will enter the following preliminary injunction:

- **Sarah is enjoined from soliciting business for the Supplier from any cheese manufacturer whose account she was assigned to manage during the twelve months before she stopped working for Garon. This injunction shall last for eight months following entry of this preliminary injunction**. In light of her close attention to these cheese manufacturer customers and her inevitable memory of their past purchasing needs and sales terms – Garon's confidential information and trade secrets – Sarah is unlikely to be able to refrain from using this information for the benefit of the Supplier. This preliminary injunction is limited in time because of the limited relevance of such customer information in light of changing prices and purchasing needs. This preliminary injunction will essentially last for a little more than a year after Sarah's employment with Garon ended, at which point her knowledge of Garon's confidential information and trade secrets will be stale. This preliminary injunction does not prevent Sarah from

11

servicing any of these cheese manufacturers who independently become customers of the Supplier by means other than her solicitations.

- **Sarah is enjoined from soliciting business for the Supplier from any cheese manufacturer she knows is or was a Garon customer by mentioning or using any specific information in the solicitation about their past purchasing needs or sales terms.  This restriction includes mentioning in the solicitation the specifications of the products she knows from her experience at Garon were sold to that cheese manufacturer by Garon.**  This preliminary injunction does not prevent Sarah from responding to a cheese manufacturer's request for products that it has purchased from Garon so long as the request for those products is initiated by the cheese manufacturer.

- **Sarah is enjoined from referring in her solicitations to (1) Garon or (2) any other information from which a cheese manufacturer is likely to draw the conclusion that the Supplier provides Garon with the products Garon sells under its name.  This restriction includes, but is not limited to, mentioning in the solicitation the specific weights of products in conjunction with the method of packaging that were sold exclusively by Garon (e.g., 43-pound pails) and inviting the cheese manufacturer to compare the quality audit documentation of Garon and the Supplier.**  Because of its limited familiarity with the relevant industry, the Court is unable to list every piece of information from which Garon's supplier's identity could be discovered, but the Court encourages Sarah to respect the letter as well as the spirit of this injunction or risk being haled back into Court for additional preliminary injunctive proceedings.  This preliminary injunction does not prohibit Sarah from responding to a cheese manufacturer's request for products packaged in the specific weights and methods sold by Garon or for a list of the packaging weights and methods available from the Supplier, so long as the request is

initiated by the cheese manufacturer.

**IT IS SO ORDERED.**
**DATED: July 2, 2013**

s/J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**
